## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
RYAN MONTALVO                         :        CASE ACTION NO.
      Plaintiff                       :
                                      :
                                      :
v.                                    :
                                      :
BURRIS LOGISTICS CO.                  :
      Defendant                       :        JULY 17, 2012
-------------------------------------------------------x
```

## COMPLAINT

### INTRODUCTION:

1.       This is an action to redress employment retaliation in violation of

the Fair Labor Standards Act, 29 U.S.C.A. Sec. 215, *et seq.*, as well as common

law wrongful discharge in violation of public policy, violation of Conn. Gen. Stat.

Sec. 31-51q, and breach of the implied covenant of good faith and fair dealing.

### PARTIES AND JURISDICTION:

2.       The plaintiff, Ryan Montalvo, (hereinafter referred to as "the

Plaintiff"), is a resident of the Town of Bristol, State of Connecticut.

3.       At all relevant times herein, the defendant Burris Logistics Co. (the

"Defendant") was and is a Delaware corporation with its principal place of business

in Delaware.  The Defendant operates twelve warehouse locations across eight

states throughout the eastern United States.  The Defendant primarily engages in

the business of storage and distribution of refrigerated and frozen foods.

Defendant operates twelve warehouse facilities, targeting wholesale distribution to

retail food vendors, focusing on the wholesale market.

1

4.      At all times relevant herein, the Defendant owned and operated a warehouse operation which distributed refrigerated and frozen food in the Town of Rocky Hill, State of Connecticut.

5.      Jurisdiction of this Court is invoked under the provisions of 28 U.S.C. §1331, federal question jurisdiction, as the Plaintiff's claims arise under the laws of the United States, namely, the Fair labor Standards Act, 29 U.S.C.A. Sec. 215, *et seq.*

6.      The Plaintiff worked for the defendant Company from on or about October 1, 2008 through the wrongful termination of his employment on or about February 21, 2012.

7.      The Plaintiff performed the duties of an Incentive Selector, and occasionally the duties of Incentive Lift Operator and Incentive Loaders.

8.      The duties of Incentive Selectors were as follows:

   a.  Performing all tasks required of them;
   b.  Selecting, labeling, wrapping, loading, and documenting orders for customers;
   c.  Rebuilding pallets;
   d.  Re-handling cases for loading or other purposes;
   e.  Combining small pallets;
   f.  Cleaning up all areas of the facility;
   g.  Preparing to work;
   h.  Battery or equipment changes;
   i.  Ensuring safe working conditions;
   j.  Picking up and processing damaged cases;
   k.  Specific projects assigned by supervision; and
   l.  Unproductive time spent waiting to perform any of the above after commencement of the shift.

9.  The duties of Incentive Lift Operators were as follows:

   a.  Performing all tasks required of them;
   b.  Moving of inbound product from the floor to designated reserve positions and from reserve slots to the designated pick slots;

2

   c. Unwrapping of pallets;

   d. Handling inbound pallets;

   e. Moving reserve pallets to pick slots;

   f. Moving pallets found in the wrong location or that will not fit into a pick slot;

   g. Properly rotating product in pick slots and overhead reserves;

   h. Removing wrap, slip sheets, and cardboard from pallets being placed into pick slots and throwing them away in the appropriate location;

   i. Making appropriate entries on the forklift computer system;

   j. Picking up empty pallets with the forklift and stacking them where appropriate;

   k. Handling cases in the course of filling a pick slot;

   l. Removing empty pallets from pick slots;

   m. Cleaning up all areas of the facility;

   n. Preparing to work;

   o. Battery or equipment changes;

   p. Time spent ensuring safe working conditions;

   q. Picking up and processing damaged cases;

   r. Specific projects assigned by supervision; and

   s. Unproductive time spent waiting to perform any of the above after the commencement of the shift.

10.   The duties of Incentive Backhaulers / Unloaders were as follows:

   a. Performing all tasks required of them;

   b. Unloading of inbound trailers;

   c. Stacking or restacking of product to required pallet configurations;

   d. Staging of pallets on the dock for inspection;

   e. Arrangement of product for check-in by receivers;

   f. Transport of the pallet to the designated reserve rack or appropriate area;

   g. Unloading trucks;

   h. Building pallets to fit the particular warehouse's pick or reserve slots;

   i. Transporting pallets to a staging point as close as possible to the designated reserve rack;

   j. Completing all required paperwork;

   k. Rehandling cases or pallets for any purpose;

   l. Cleaning up all areas of the facility;

   m. Preparing to work;

   n. Battery or equipment changes;

   o. Time spent ensuring safe working conditions;

   p. Picking up and processing damages cases;

   q. Specific projects assigned by supervisors; and

   r. Unproductive time spent waiting to perform any of the above after commencement of the shift.

11.     The Plaintiff was generally responsible for moving inbound and outbound product to and from designated positions between refrigerator or freezer and the trailer trucks for distribution.

12.     The Plaintiff was paid utilizing a malleable time management system to provide incentive for employees to work faster.

13.     The Defendant did not provide the Plaintiff with a written document explaining this complex wage calculation system.

14.     The Defendant orally represented to its employees that their rate of pay would be divided into three main categories: the "Base Rate," the "Incentive Rate," and the "13 Week Average Rate."

15.     The Defendant represented to the Plaintiff that he would be paid at least at the Base Rate of $12.00 per hour for every hour worked.

16.     The Base Rate was the lowest amount the employee was supposed to earn per hour: a floor of $12.00 per hour.

17.     The Defendant did not pay at least the Base Rate for every hour worked.

18.     Employees were to be paid an Incentive Rate, not as a discretionary bonus, but rather as a rate which the employee earned by performing assignments faster.

19.     The Incentive Rate would be paid for performing assignments that were engineered for a standard number of minutes, called the "Engineered Standard Times."

20.     The Engineered Standard Times depended upon numerous factors, such as the distance which product was to travel and the amount of product transported.

21.     The number of minutes it actually took employees to complete assignments with Engineered Standard Times would be recorded as their "Actual Time."

22.     Actual Time should only have been recorded as time spent performing tasks with Engineered Standard Times because the exact start and completion times were recorded by computer.

23.     The Defendant represented to the Plaintiff that the Actual Time to perform assignments with Engineered Standard Times would be recorded by a system called APT.

24.     The Incentive Rate would be paid based upon an employee's "Performance Percentage."

25.     The Performance Percentage is the Engineered Standard Time divided by the Actual Time to perform the assignments.  If a worker completed an assignment with an Engineered Standard Time of 30 minutes in 20 actual minutes, the Performance Percentage was 150%.  If a worker completed an assignment with an Engineered Standard time of 30 minutes in 30 actual minutes, the Performance Percentage was 100%.  If a worker completed an assignment with an Engineered Standard time of 30 minutes in 37.5 minutes, the Performance Percentage was 80%.

26.     The Performance Percentage determined the Incentive Rate through a scale which Defendant had created, hereafter referred to as the "Incentive Compensation Scale."

27.     The Incentive Rate was to be determined based upon where employees' Performance Percentage falls on the Defendant's Incentive Compensation Scale.

28.     On the Defendant's Incentive Compensation Scale, employees were to be paid at a higher Incentive Rate when their Performance Percentage increased and at a lower Incentive Rate when their Performance Percentage decreased.

29.     A change in Performance Percentage would not result in an exact percentage measure of the change in Incentive Rate—it was scaled.

30.     The Defendant represented to its employees that their Incentive Rate would increase as they completed jobs faster and minimized the Actual Time in which they completed assignments with Engineered Standard Times.

31.     The 13 Week Average Rate was based on the average Incentive Rate in the previous 13 week period, including differentials but not overtime premiums and time not worked.

32.     The 13 Week Average Rate was calculated with a two week lag for each thirteen week period and was adjusted continuously.

33.     Every loss of time that affected the employees' Incentive Rate also affected the employees' 13 Week Average Rate.

6

34.     The Defendant would manipulate the Incentive Rate, and also affect the 13 Week Average Rate, at the discretion of management, and did not tell employees their pay rates would vary at the discretion of management.

35.     The Defendant routinely adjusted downward the Engineered Standard Times for assignments.  This caused the Performance Percentages to drop, and also decreased employees' Incentive Rates and 13 Week Average Rates.  This was effectively an unauthorized reduction of the compensation rate which Defendant had represented it would pay its employees.  This would occur when orders were slow, productivity was at a ceiling, and the Defendant was motivated to reduce labor costs.  During busy times, the Engineered Standard Times would return to normal.

36.     During various periods of time which should have been paid at the 13 Week Average Rate, at the discretion of management, whether or not downtime was within the employees' control, the Defendant paid less than the agreed upon rate by adding that time to its employees' Actual Time.  The effect was to drive down the Incentive Rate such that the employees not only received less than their agreed upon salary, but the employees received no additional payment for that time worked.

37.     During various periods of time which should have been paid at the Base Rate, at the discretion of management, the Defendant paid less than the agreed upon rate by adding that time to the employees' Actual Time.  The effect was to drive down the Incentive Rate such that the employees received no additional payment for that time worked.

7

38.     The Defendant routinely paid the Base Rate for work which should have been paid at the 13 Week Average Rate.  Defendant would assign employees tasks such as wrapping pallets, assisting with equipment, "replenishment", "put-aways", attending meetings, order processing delays, selector delays, time lapse between last order and punch out, and miscellaneous technical issues.  Defendant would routinely record that time as Base Rate Time despite that it was not within the employees' control.

39.     Due to the aforementioned unauthorized reductions in pay, the Plaintiff made frequent complaints as he noticed his pay getting shortchanged.

40.     Sometimes the Defendant would correct the Plaintiff's pay, and sometimes the Defendant refused to correct the Plaintiff's pay.

41.     The Plaintiff 's complaints about being shortchanged in his pay become more frequent prior to his termination.

42.     On or about February 17, 2012, the Plaintiff was assigned some lift operator duties.  He and several Lift Operators noticed that the same machine which had often shortchanged them as to time was again making serious errors which adversely affected their pay.

43.     The Plaintiff and several Lift Operators approached the new General Manager as a group and made their complaints known to the new General Manager.

44.     The Plaintiff and the Lift Operators complained that they were again being shortchanged by the Defendant's operating system, and in particular a machine which continued to shortchange lift operators on their time output.  The lift

operators had been complaining that this machine was shortchanging their pay for more than a year, and that nothing had been done about it. Conversely, if a machine made errors to the benefit of the employees, such machines and errors would be fixed immediately.

45.     During this period of time, the Defendant was particularly defensive of complaints of workers' pay being shortchanged because there was a campaign to unionize the facility.

46.     On or about February 17, 2012, the Plaintiff was called into a meeting with supervisors where they questioned him for three hours about why he was complaining about the Defendant's wage system.

47.     The Plaintiff explained that the system was cheating him and his coworkers.

48.     The Plaintiff explained that the incentive system, implemented approximately two years earlier, was causing Burris employees to suffer more injuries while working faster in their efforts to increase productivity and drive up wages.

49.     The Plaintiff also explained that he and other employees thought the incentive wage system was unfair because they would be severely penalized for production delays beyond anyone's control.

50.     The Defendant said that the Plaintiff was needed to provide leadership to new employees when they complained about such issues, and that was why the Plaintiff had been chosen for the "Hiring Team." The "Hiring Team"

made the final selection out of candidates for employment pre-chosen by Human Resources.

51.     The Plaintiff stated that he quit the hiring team because he did not want to take part in the Defendant's misrepresentations about what employees would make under the Defendant's wage incentive system.

52.     The Plaintiff explained that he was tired of babysitting the Defendant on correcting his paychecks.

53.     The Plaintiff explained that he would have several corrections on his recorded hours every week.

54.     The Plaintiff explained that even after many reported corrections through his daily checking and verification during the course of each week, his weekly paychecks were still shortchanged twice per month on average.

55.     Before February 20, 2012, the only type of conduct for which the employer disciplined the Plaintiff was for not meeting a production quota on one day when the Defendant believed the Plaintiff could have done so.

56.     Prior to February 20, 2012, the Plaintiff had never refused to obey a supervisor's order.

57.     On February 20, 2012, at 6:45 a.m., a water main broke in the employer's warehouse and water covered the warehouse floor.

58.     On February 20, 2012, a great deal of water turned to ice in the freezer area of the warehouse.

59.     On February 20, 2012, the Plaintiff reported to work for his 8:00 a.m. shift.

60.     On February 20, 2012, after the Plaintiff reported to work, two supervisors named Xavier Gomez and Christopher Costa went to the cafeteria where the Plaintiff and other employees were waiting.

61.     On February 20, 2012, Costa and Gomez asked for volunteers to help remove water from the warehouse.

62.     On February 20, 2012, neither Gomez nor Costa ordered the employees to help.

63.     On February 20, 2012, no supervisor or manager ordered the Plaintiff to remove water from the employer's warehouse.

64.     The Plaintiff noted to his fellow employees that the removal of water seemed unsafe because in the past, whenever a spill in the warehouse occurred, the custom and practice was to put cones around the spill and to tape off that area until it could be mopped and cleaned so that employees did not slip.  The Plaintiff discussed this with his fellow employees.

65.     The scope of the spill resulting from the broken water main was larger than any spill at the facility previously, and the Plaintiff (and many other employees) did not have rubber boots to walk through the spill.

66.     On February 20, 2012, between 8:00 a.m. and 10:15 a.m., there were an insufficient number of squeegees to remove water from the Defendant's warehouse.  The squeegees were necessary tools for removing the water, and every squeegee to the Plaintiff's knowledge was being used to remove the water.

67.    On February 20, 2012, at 10:15 a.m., a supervisor named Dexter Lee ordered the Plaintiff and other employees to chip ice from the employer's warehouse.

68.    On February 20, 2012, the Plaintiff stated to Supervisor Dexter Lee that he preferred not to chip ice in the freezer because the steel toed boots which employees had to wear did not have any spikes or grips to prevent from slipping on the ice. He directed me to go to the Shipping Manager, Michael Wingate.

69.    The Plaintiff saw H.R. Manager Donna Szaban on his way to see Michael Wingate. The Plaintiff questioned why he was being asked to chip ice when it was so far out of his job description. Donna Szaban told me to sit down and I waited for her to set a meeting with the new General Manager Robert Hayes and Michael Wingate.

70.    The Plaintiff stated to Wingate, Szaban, and Hayes that he did not want to chip ice because he believed it was unsafe, and because he did not believe the ice chipping assignment was within his job description as a selector.

71.    The Defendant did not assign the employees any production duties in the freezer portion of the warehouse because the conditions were unsafe.

72.    The Defendant did however have other employee assignments which it could have assigned the Plaintiff.

73.    In the past, if the Plaintiff requested another assignment, the Defendant would simply issue another assignment.

74.    Instead, on February 20, 2012, the Defendant told the Plaintiff to punch out.

75.    On February 21, 2012, the Defendant terminated the Plaintiff's employment on the pretext that he refused an order.

76.    Plaintiff and several other employees were terminated on February 21, 2012.

77.    The Defendant used the incident involving the water main as a pretext to terminate a number of employees who Defendant desired to terminate. The Defendant used a pretext for the terminations to cover its true motivations, which were illegal:

a.    Retaliation for making complaints of wage violations;

b.    Retaliation for making safety complaints; and

c.    Retaliation for complaints of sexual harassment.

78.    The Defendant has exhibited a pattern of retaliating against employees who have asserted protected rights, including employees who have complained of being shortchanged in their wages, employees who have complained of safety issues, and employees who have brought workers' compensation claims.

**COUNT ONE:**    **Retaliation in Violation of the Fair Labor Standards Act, 29 U.S.C.A. Sec. 215, *et seq.***

1.    The Plaintiff repeats and re-alleges Paragraphs 1 through 78 above, as Paragraphs 1 through 78 of Count One as if fully set forth herein.

79.    Through the aforementioned conduct, the Defendant terminated the Plaintiff in retaliation for his complaints of Defendant's violations of the Fair Labor Standards Act.

80.     As a result of the aforementioned conduct of the Defendant, its agents, servants and/or employees, the Plaintiff has suffered a loss of wages, benefits, and other consequential damages.

81.     As a further result of aforementioned conduct of the Defendant, its agents, servants, and/or employees, the Plaintiff has been forced to incur attorney's fees and costs in order to obtain the rights to which he is entitled.

82.     The Plaintiff claims double damages, attorney's fees, and costs pursuant to 29 U.S.C. § 216(b).

**COUNT TWO:**     **Wrongful Termination in Violation of Public Policy (Plead in Alternative to Counts Three and Four)**

1.     The Plaintiff repeats and re-alleges Paragraphs 1 through 78 above, as Paragraphs 1 through 78 of Count Two as if fully set forth herein.

79.     As a result of the Defendant's conduct, the Plaintiff has suffered significant financial losses.

~~80.     As a further result of Defendant's conduct, the Plaintiff has been~~ denied wages and benefits to which he is entitled.

81.     As a further result of the Defendant's conduct, the plaintiff has been caused to suffer emotional pain and suffering.

82.     As a further result of the aforementioned conduct, the Plaintiff has been forced to incur attorney's fees and costs in order to obtain the rights to which he is entitled.

14

**COUNT THREE:**   Wrongful Termination in Violation of Conn. Gen. Stat. Sec. 31-51q, *et seq.* (Plead in Alternative to Count Two)

1.      The Plaintiff repeats and re-alleges Paragraphs 1 through 78 above, as Paragraphs 1 through 78 of Count Three as if fully set forth herein.

79.      As a result of the Defendant's conduct, the Plaintiff has suffered significant financial losses.

80.      As a further result of Defendant's conduct, the Plaintiff has been denied wages and benefits to which he is entitled.

81.      As a further result of the Defendant's conduct, the plaintiff has been caused to suffer emotional pain and suffering.

82.      As a further result of the aforementioned conduct, the Plaintiff has been forced to incur attorney's fees and costs in order to obtain the rights to which he is entitled.

**COUNT FOUR:**   Breach of the Implied Covenant of Good Faith and Fair Dealing (Plead in Alternative to Count Two)

1.      The Plaintiff repeats and re-alleges Paragraphs 1 through 78 above, as Paragraphs 1 through 78 of this Count Four as if fully set forth herein.

79.      As a result of the Defendant's breach of the implied covenant of good faith and fair dealing, the Plaintiff has suffered significant financial losses.

80.      As a further result of Defendant's breach of the implied covenant of good faith and fair dealing, the Plaintiff has been denied wages and benefits to which he is entitled.

15

81.    As a further result of the Defendant's breach of the implied covenant of good faith and fair dealing, the Plaintiff has been caused to suffer emotional pain and suffering.

82.    As a further result of the aforementioned breach of the Defendant, the Plaintiff has been forced to incur attorney's fees and costs in order to obtain the rights to which he is entitled.

**WHEREFORE,** the Plaintiff demands the following:

1.  jury trial;

2.  back pay;

3.  front pay;

4.  double damages, attorney's fees, costs and interest pursuant to 29 U.S.C § 216(b);

5.  punitive damages; and

6.  such other relief as the court deems just and appropriate.

THE PLAINTIFF,
RYAN MONTALVO

By: _____
Angelo Cicchiello (ct06503)
Emanuele Cicchiello (ct27118)
Michael J. Reilly (ct28651)
Michael T. Petela, Jr. (ct28251)
Cicchiello & Cicchiello, LLP
364 Franklin Avenue
Hartford, Connecticut 06114
Tel: (860) 296-5457
Fax: (860) 296-0678
Email: mpetela@cicchielloesq.com
Their Attorneys